Please just identify for us your name and which of the appellants are under your advocacy. Yes, Your Honor, may it please the Court, my name is Matt Wald. I represent the appellant Dale Old Horn. Mr. Old Horn was the director of the Crow Tribal Historic Preservation Office. So he was somewhat, he was, I guess, defendant number one according to the government's allegations. And what's key to this case is the factual scenario is somewhat unique when it comes to a, I guess you'd call a reservation fraud case in the sense that it's not, it wasn't a typical situation where, for example, someone's running a tribal business or a casino and they're reporting less profits, pocketing the money, anything like that. This started out as an employment policy dispute with the then Crow Tribal Chairman, Cedric Black Eagle, about a supplemental pay plan that Mr. Old Horn put into place. And essentially the issue was whether the employment policy at that time barred outside compensation. The reason that matters a lot is because the gist of the problem at trial was that Mr. Old Horn was denied his right to a fair trial because of exhibits key to the issue about the policy dispute. And therefore key to the issue of good faith and lack of intent to defraud. So... Are you referring to the statement of understanding that was attached to his response letter? Yes, Your Honor. The response letter was admitted into evidence, right? Correct. And so, but the district court said the statement of understanding was hearsay. And I understand there was no objection to it during the trial, is that right? In what sense, Your Honor? That there was an objection to the, or was there? According to my notes, there was no objection to the district court's ruling that Exhibit 1513, which was the statement of understanding, would not be admitted. There wasn't specific offer of proof given on that, but the exhibit was offered. The government objected. The court sustained that objection. And then there was no response from the defendant. That's true. But, Your Honor, what's interesting about those, 1511 was allowed. 1511 was Cedric Black Eagle's comment that the policy violated the employment policy. 1512 was Mr. Oldhorn's response as the director that he didn't believe it did. His reasonings were in 1513, and Judge Haddon allowed 1512, specifically finding that it wasn't hearsay because it was offered not for the proof of the matter, but rather state of mind. The same reason that 1513, which completely was necessary to explain the context of 1512. So your client thought that while he was a paid employee of the tribe receiving a salary to head up, run, supervise the operation of the historical preservation office of the tribe, that was perfectly appropriate for him to seek side payment, if you will, from third-party entities wishing to do business within the four corners of the tribal property, correct? Not exactly, Your Honor, because where the supplemental income came from was whenever the monitors, which had a duty to basically inspect tribal interests in any sort of prehistoric or historic value in a dig or anything like that, if Conoco, for example, was digging, they would have to go out in the field and determine whether there was any violation there. Those monitors got paid more when they were in the field, and what happened here was initially that extra pay came from their tribal paycheck, and then the company was later billed for that exact amount. By the tribe? By the tribe. And what the difference in the direct pay compensation that Mr. Oldhorn got involved with was one of the companies, which was TransCanada, had a policy of paying a direct daily amount, and that instead of charging the tribe the extra field pay, the company paid the monitors directly, but it involved a no net loss period. When you say the monitors, are you talking about these three defendants? Yes, and then there were some other individuals. And so did they reimburse the tribe for the $10 per hour that they were getting as part of their salary for the time when they were being paid by the company? They did not. They did not. However, if there wasn't monitoring going on at any time, the $10 was paid all the time anyway, and I would point out that the government's theory specifically was not a double billing theory. They said it again and again and again. They're not concerned about that very issue. They were concerned about what they called a diversion, but those funds never would have ended up in the tribal coffers making any money for the tribe. If I understand your argument, are you saying if, let's say, an oil company is going to pay $400 for a day for someone to watch them dig a certain area, they pay that $400 to the tribe. Does the tribe pass it through directly to your client? My client, just to be clear, Your Honor, my client never received any of this payment. He was the director. He didn't ever make field pay. But he believed that it was completely acceptable to have the outside companies pay the monitors directly for field pay rather than the company. But yes, you're right. When the tribe would bill the companies, it was for this exact amount that the monitors already got paid. So it was merely a reimbursement. And then what happened was the tribal accounting office quit billing, and the government's theory was that somehow that Mr. Oldhorn's changing of some of the individuals getting the direct pay affected that, but it was clear in the trial that there was no gain ever built into the TIPO office, which we call the Crow Tribal Historical. Was the tribe itself aware of this? Well, Mr. Oldhorn was... It sounds to me like that's a question that could be answered with a yes or a no. Was the tribe aware that these monitors were receiving direct payment from third-party contractors? Yes, because the tribal secretary was a direct supervisor of Mr. Oldhorn. Mr. Black Eagle was the tribal chairman, and I guess the question there would maybe no, and when he did, he issued the what was 1511 exhibit, which indicated that he didn't believe that that was appropriate and that it violated the policy, which leads me to the other complaint, which was our proposed 1525, which we thought was clearly relevant and very, very important to the case, in which that same tribal chairman modified the employment policy specifically to bar outside employment. And Mr. Oldhorn's whole issue at trial was that it wasn't barred, and there was no criminal intent, no intent to defraud at all. Okay. Counsel, you're over your six minutes. I have a feeling that our time allocations may be inadequate for the complexity here, and, of course, you should answer any questions counsel has given from one of the judges. Is there anything else you want to say right now? Just simply that it's these errors as well as the jury instructions. The cumulative effect was such that Mr. Oldhorn's right to a fair trial was compromised, and I ask the Court to reverse. Thank you. Thank you. Good morning. My name is Jay Lansing. If it pleases the Court. Counsel. I'm appearing on behalf of my client, who is Alan Joseph Oldhorn. Alan was the son of Dale Oldhorn. To convict Alan Oldhorn of mail fraud, the government needed to present proof of use of the mails or that he caused the use of the mails to carry out an essential part of the scheme. Sometimes that mail fraud element of mailing is the gatekeeper for us determining whether or not there's a mail fraud violation. When we looked at the record in this case, there is not a single witness that was presented by the government that they mailed anything to or on behalf of Alan Oldhorn. There was not a single exhibit offered to prove that Alan Oldhorn used the mails. The most that the government was able to find in the record were four items, and I'd like to just go over each of those if I could briefly. One was excerpts of record page 678, which was the government exhibit 834. It was a check from Northwestern Energy to Mark Denny. Mark Denny was one of the co-defendants. He pled guilty early on in this case, but he was not at the trial of our particular case. But at the same time, there was no evidence that that check was ever mailed to Mr. Denny. It just had his name and address on the check. Then the second item was there was an e-mail from Martin Oldhorn to Vicki Wespe of ConocoPhillips with the number of hours that he had worked and his mailing address. That was government exhibit 969. The other item that the government pointed out was the testimony of Vicki Wespe of ConocoPhillips that she had mailed checks to Martin Oldhorn and also Donnell Oldhorn. I would point out to the court that both Donnell and Martin were both dismissed from this particular indictment and were never convicted of anything out of this indictment. But the more important thing is that both of those exhibits that I've talked about, exhibit 834 and 969, were admitted by Judge Haddon over the objection of the defendants. That occurred at page 615 of the record. Can you also address, I have in my notes that, I guess this is at SER 235, this is testimony from TransCanada that said that we paid these monitors directly, Allen Oldhorn, Mark Denny, and Sean Danforth. And then on SER 242, it says, the same witness, we always cut checks on Thursday, and then you know they would go in the mail. So checks went out on Thursday. And then this was in the context of this discussion about paying the monitors, including Allen Oldhorn. So am I misunderstanding that, or does that support the mailing claim? Judge, I would sit there and say two things. I don't believe that it does, and here's why. The victim, according to the government's indictment of the mail fraud, is the Crow tribe. And one of the things that occurred during the course of this whole prosecution was identifying whether the victim was these individual companies, like Wasatch Electric or TransCanada, or whether it was the Crow tribe. And when we start talking about the mail fraud, and when we start talking about the violation of 666A1A and some of those other statutes, again, the victim in those counts is the Crow tribe. So one of the things that we were always wondering about is what mailing was done in furtherance of that scheme to defraud, again, the Crow tribe. Let me see if I understand your argument correctly. The allegation in the indictment was that your client, with the father and son-in-law, received direct payment from contractors. And I believe the total amount was $500,000. Is that correct? The total amount that was paid from the outside companies to all of the individuals? Yes. I would disagree with that, Judge. The total amount of all of the checks was, I'd say, yes, $500,000. And these direct payments would be mailed by a company like Conoco directly to your client? Or they might pick them up. Again, yes or no? If I'm wrong, tell me if I'm wrong. I'd say, Judge, there was no evidence in the record that they mailed the checks to Alan Oldhorn. I mean, at the end of the day, I realize... Nobody says they mailed them. I'm sorry? The company said they mailed them? There was the testimony that I just read. Am I misunderstanding that that's TransCanada saying they mailed the check to Alan Oldhorn and others, Mark Denny and Sean Danforth? Well, Judge, I understand what you're saying. I would sit there and say that, one, those are not checks that were paid by the Crow tribe. Those are checks that were made by these outside companies. And so they don't fall... That's the whole theory of the indictment. The whole theory of the indictment is that the three defendants and perhaps others were paid tribal employees under a program partially funded by the United States government and therefore the taxpayers, and their job was to maintain the historic and traditional integrity of things of value to the tribe historically within its boundaries and to monitor outside agencies who were drilling, extracting, building, or whatever, and that these companies, instead of dealing with a paid tribal employee, were paying money directly to, among others, the three defendants in this case, and that the tribe didn't know about it. That's correct, Judge. And the way in which these direct payments, as your co-counsel characterizes them, the way in which they were transmitted was by the contractors by mail to one of your three clients. Is that right? And all I'm saying, Judge, is the question is whether in the record there is testimony other than I understand, Judge Nakuda, about the reference that you made in regard to TransCanada, and the question is whether or not there's any other testimony about any actual checks being mailed to Alan Oldhorn or that he caused to be mailed. And what I'm also saying is that I realize that we're sitting here talking about the money that the outside companies sent to these different individuals. Any evidence that these were hand-delivered? There's no evidence in the record. Transmitted by courier? I would tell you, Judge, there's obviously discussion and there's testimony like by Ms. Hammert that worked for Wasatch Electric that Alan Oldhorn was asking about when she might be able to FedEx the check to him. I mean, that's there, Judge. But at the end of the day, the question is whether or not there was actual evidence of these documents being mailed to Alan Oldhorn or to other defendants. That's your point. Thank you, Judge. Okay, thank you, counsel. Good morning. I am Lance Lundvall. I have the privilege of representing Sean Danforth. There seems to be a little bit of confusion about the lay of the land with this program, and it is a complex case. My client was simply a monitor. He was not in a position of power whatsoever. He was not the director. Dale Oldhorn was the director of the program. Alan Oldhorn was at least a supervising monitor. My client was simply a monitor, an employee. Did he receive direct payments? He did. And exhibit number one... How did they get to him? There was no evidence of that at trial. There was, as Mr. Lansing pointed out, references to e-mails with addresses and so forth, but there was never a shred of evidence submitted at trial. So do you also disagree that this says that TransCanada paid Sean Danforth by cutting checks on Thursday and they would go in the mail? So am I misunderstanding that? Do you disagree? No, Judge. I think you are correct. However, again, this case was about defrauding the Crow tribe, not defrauding these companies. But you keep saying that there's no evidence that the company sent checks to these monitors by mail, and I thought there was other evidence as well, but this seemed pretty clear. So unless I'm misunderstanding it, that's just there was evidence that the companies were sending these monitors checks by mail. There was evidence of the companies cutting checks. There was not evidence from the Crow tribe, and it's the Crow tribe who is also paying these individuals that is the victim in this case. So I would argue that the government was required to put on evidence that the Crow tribal office, the payroll office, should have put on evidence that they were sending these checks in the mail, not necessarily the companies, because again, the indictment was clear. This is a case about defrauding the Crow tribe, not defrauding these companies. I will grant you that during the case of this trial, the government was kind of a moving target. The government kind of focused on the dollar amounts that were paid out by these companies to create this rather large figure, but the bottom line, and this is clear in the record, that for loss calculation purposes, the district court ruled that the amount of loss was the amount the Crow tribe was out, not what was paid. That was for sentencing, though. That wasn't what was proven at trial. No, but it is still indicative of what was an issue at trial. So the magistrate judge had made an assumption that the tribe would give this additional money, the $400 a day or $500 a day, to the monitor, but was there evidence, was there testimony to that effect at the sentencing hearing, or was there testimony to that effect at trial? I'm sorry, can you repeat that? The magistrate judge assumed or speculated that the tribe would allow the monitor, would reimburse or pay to the monitor all of the money that was received from the company. Was there testimony to that effect at trial? Yes. That the $400 or $500 a day that the company was paying, because the tribe was charging the company only $25 an hour, so $200 a day for an 8-hour day. Correct. My math is right. I understand your point, yes, you're correct. So was there evidence that the tribe would have taken the same approach had the company been willing to pay $400 or $500 a day? No, the Crow tribe was simply a pastor. They didn't actually make any money on these. Right, that was their program, was that they would bill the company, so they would bill the company for the full $25 an hour, and then they would get the $10 back that they were paying in salary, and then the additional $15 went to the monitor, is that right? They paid out the same amount to the monitor that they got. Which was $15, it was $25, right? $25. Because they continued to pay the monitor the $10 an hour that the monitor got on payroll, correct? And then they would get $15 extra when they were monitoring, is that right? That's correct. When they were simply in the office, they were getting the $11. So that was the tribe's program, but there was no evidence that I saw, maybe you can correct me, that had the tribe known about this independent payment of double what they were charging, what the tribe was charging the company, that they would have taken the same approach. Was there any evidence? Well, and that goes to our defense, and it goes back to what Mr. Wald discussed with regard to this change in policy. There was an investigation into this, and there was a discussion about whether or not what the monitors and what the program was doing was proper. The chairman at the time said, wait, you can't do this. Mr. Oldhorn, Alan Oldhorn, said no. This payment process has been used previously. It's proper. There is nothing in the policy manual that says we can't do this. And then lo and behold, a few months later, there's a new policy that strictly prohibits it. And one of our arguments, and Mr. Wald didn't get an opportunity to discuss it much, Exhibit 1524 was, in fact, this policy where they changed it to be specific. So I thought the vice secretary had advised him that in order to make the change, he had to get the approval of the chairman, and that he didn't seek the approval to make the change. Well, there was a disagreement about whether or not it was authorized or not. So the vice secretary, who was his supervisor, advised him that in order to change the billing practice, he would have to get the approval of the chairman, and he didn't seek the approval? Is that right? Well, again, there was some discussion about that, and there was a flat of disagreement about whether or not it was authorized. So he did seek the approval of Chairman Black Eagle? Yes, he wrote the letter to Chairman Black Eagle to discuss the policy. Again, he fully believed that he was authorized to do what he ordered my client to do. And ultimately, that's what I'm here for is my client was simply an employee. Dale Oldhorn instructed my client to bill directly, and so my client billed directly. He was not part of any sort of discussion about whether this was appropriate or not. He was just an employee doing his job. What was his salary as an employee of the tribe? It was the $11-something an hour while he was in the office  How much did he receive in direct payment? I don't have that number in front of me, Judge, I apologize. I can provide that to the court. If you know. I don't. I don't recall. Did your client know that the tribe disapproved of the direct payments? He was not aware of that. He was not aware of those discussions. There was nothing in evidence to suggest that he had any involvement or knowledge of that. Okay, thank you, Counselor. Thank you. We now hear from Mr. Rosted. We've got three guys ganging up on you, but you've got three people. That's all right, Judge. They did it at trial. I can take them on appeal. I'm broad-shouldered, so I'm sure you can handle it. Absolutely, Your Honor. Let's start with the mailing. Okay. With the mailing, Your Honor, those four instances that I cited in the record were merely examples. If you look at the checks that were all brought into evidence, they all include the name and a mailing address, which we believe is at least circumstantial evidence to support the direct testimony that the checks are mailed. You add to that the second thing is this really is a scheme that was kept from the tribe, so it was important that the checks not go to the tribe or to any tribal address like the THPO office, but that they go to the people's individual residences. Would you agree that if all of the payments had been made hand-to-hand that you wouldn't have a mail fraud violation? Yes, sir. Then we would have probably gone under another theory. Did anyone from any of the companies making direct payments testify that these checks were actually mailed? Yes, ma'am. Yes, sir. Ms. Wesby is in the record saying they were. We didn't bring. Sometimes of the witnesses we brought from the company weren't the ones that were actually cutting the checks. We did bring Ms. Wesby, and she was involved in cutting the checks, and we specifically elicited from her that the checks were mailed. So is this the issue on whether the checks were mailed under the Jackson v. Virginia sufficiency of evidence standard where we give the government all reasonable inferences? I believe that, Your Honor, especially in the absence of any contrary indication. None of these defendants took the stand. No one ever said the checks weren't mailed. In other words, give the government a chance to rebut that. That's not their burden. It's not, Your Honor. Mailing is your burden. It is, Your Honor. But my point is when viewing it in the light and what's favorable to the prosecution, the absence of any evidence of the contrary should be taken into account. Well, you've got the checks showing, as you've described it, you say the checks on their face have the mailing addresses. Yes, many of them do. Some, though, depends on the company. It might be a reasonable inference they were mailed. And certainly one of our emails that we cited, I believe in our record, was when Donnell Oldhorn told them to send the check to her son in Missoula and gave his Missoula address. Let me ask you sort of a big-picture question of part of what's on my mind. I may not fully understand this conspiracy, but if, in fact, if the tribe had gotten these payments from a pipeline company or oil company, they would just have sent them to the monitors. So the money would just pass through the tribe to the monitors. Then it's sort of like where's the beef? What's the evidence here of damage to the tribe? And, for example, one offense of conviction is theft from the tribe or a tribal organization. And I think there's a $10,000 requirement to make that out. So what's the evidence that that amount was stolen from the tribe? Under 666, Your Honor, my obligation is to prove that the tribe got more than $10,000 in any one year in federal funding. The transactions have to involve a series of transactions involving $5,000, and their yearly salaries would cover that amount. And, again, we get back to the idea that, as Judge Ikeda was bringing out, was that that's where the fraud against the tribe really is. The theft is that they got their salaries. They got their salaries. That was really not our theory at the beginning, Your Honor, because in the beginning we were dealing with a different victim. We were dealing with Cedric Black Eagle and his administration, and their position basically was these guys have diverted a revenue stream. By the time that we were at the end of the process and at sentencing, Dale Oldhorn's grandson, Old Coyote, Darren Old Coyote, had become chairman, and the position they took there was that it was a pass-through, although I can't argue that at trial that's what they said. They would have billed them the $25. They would have paid them the $25. So what the tribe is really out is the $10 that they would have been reimbursed, that they paid that they did not get reimbursed for. So opposing counsel says there was no evidence adduced at trial that would show how much of their salary was taken away from the tribe. So it would only be the $10 per hour during that period when they were getting direct payments from the company. And they claim there wasn't any evidence showing or that would allow anyone to calculate, the jury to calculate, how much was actually taken away from the tribe if we're only looking at salary. Well, if I understand your question, I guess I don't understand your question. Okay, so the tribe has these monitors on payroll, $10 an hour, say. And most of the time they're entitled to the $10 an hour only when they are monitoring should the $10 per hour be reimbursed by the company. That's my understanding of the program. So opposing counsel says there isn't evidence in the record that was before the jury as to the amount of $10 per hour that they were double paid because they were monitoring during that period. So if for two months a year they were monitoring and therefore the tribe was deprived of the $10 per hour in salary that it continued to pay them, we would need to add all that up to get to the $5,000. Is there evidence in the record that $5,000 was paid to the defendants by the tribe during a time period when they were monitoring? Yes, Your Honor. And where is that? That is all in the exhibits. We put in their entire personnel files with all their timesheets and all of the payments, not the payments from the tribe, but the timesheets demanding payment for the $10 an hour for every month of every year that the eight monitors that were involved, that we have involved here, were receiving money from the tribe. And that was put in during the trial as part of the trial exhibits? Yes, in bulk exhibits, hundreds of pages of exhibits. Let me return to just some things. I'm sorry, Judge. I have a question on that. I still have sort of a, I don't know how to phrase it, but sort of like a where's the beef question in my mind. Sure. There are a lot of family frauds. There's a lot of errors that families make sometimes as a concerted group, but this isn't like the Sopranos. If the money was really going to go from the tribe to these people when paid by Keystone or Conoco, then I don't really understand why there's a prosecution here. Well, Your Honor, again, we believe that the interference with the governmental function at the Crow tribe was sufficient in and of itself to warrant prosecution. As the court has pointed out in earlier questioning, Mr. Oldhorn went to his grandson who was vice chairman or vice secretary and in charge of the program and said, I want to change it to direct pay. And the vice secretary said, no, you'd have to go to the chairman to do that, and then he went ahead and did it anyway. So we see it as a little bit larger of an issue than just money. In terms, if you're asking, our motivation for prosecuting a case like that. That's a fair response, I think, as to why the case was brought. But if that theory didn't pan out, do I understand that you ended up not proving that theory? Your Honor, what I ended up not being able to prove was that the Crow tribe would have been entitled to all of the money that was taken in direct pay. As I said, our theory was that they'd inserted themselves into a revenue stream that should have gone to the Crow tribe. Is this on the merits or sentencing that you're talking about right now? That was a sentencing. That's where the number was vastly reduced. And I've been before the court a lot, judges, and I don't think I've ever been accused of undercharging, but I think in this case I undercharged. I should have probably brought another fraud case that involved the victims, the companies, because these folks were gouging these companies for a lot more than $25 an hour, which would have been... The grand jury should have charged. The grand jury should have charged. I should have asked the grand jury to charge, Your Honors. Yes, sir. But in any event, that would have... Because, you see, when we start getting into the... The first sentence of the Fifth Amendment is still applicable, isn't it? It is, Your Honor. It is. And I don't mean to treat it non-seriously, but obviously the court knows how it works. We should have probably come against them with not only the victim being the Crow tribe, but also the victim being the companies, because the companies were charged three and four times what they would have been paying to the tribe if it had gone through the normal governmental function. So if your theory at trial was diverting a revenue scheme, is that correct? Yes, sir. Yes, ma'am. Now that we're looking at the sufficiency of the evidence, you didn't raise this diversion of the revenue scheme on appeal, but if we're looking at the sufficiency of the evidence, I'm a little confused now about how we're supposed to evaluate it. So could the jury... I mean, one question is, could the jury have reasonably concluded that there was a diversion of a revenue scheme here, a scheme to divert a revenue, and there may well be sufficient evidence? Now you're saying we should ask whether there was sufficient evidence to show a different scheme, that the Crow tribe was cheated of the $10 an hour that would otherwise be reimbursed. But that wasn't the theory on which you brought the case to the jury. Is that right? You're right, Your Honor. We went on a theory at the time of the trial that really the money should never have gone to any member of the Oldhorn family. It should have gone directly to the tribe. So you're asking... But I don't think there's a really large disconnect there in the sense of why are they having money diverted to themselves being paid directly and continuing to be paid by the Crow tribe. You're still making the Crow tribe a victim because the Crow tribe, if they had not had interference in their revenue stream, would have at least had $10 an hour to reimburse them coming from an outside source, and they wouldn't have to take it out of their general fund. Just so that I understand this, are you asking us on appeal to ask the question whether there was enough evidence before the jury to convict the defendants on a scheme that you didn't argue to the jury? No, ma'am. We still think it was a diversion against the tribe that... Of a revenue scheme? Of a revenue that the tribe would have been entitled to have to support its THPO program, which it did not receive because the defendants had chosen to bill the companies directly. Okay, I didn't see that in your briefs, but you're arguing it here to us today. I don't know that I... That's always been our theory, that they diverted the revenue stream that would have supported the THPO office. Okay. What came down, where we came down on the $10 an hour came at the time when there was loss to the tribe. That was part of your sentencing argument. That was a sentencing issue. I don't think that that affects at all. But loss also is an element of the theft, right? It is, Your Honor. So you have to show a certain amount was taken from the tribe to get that. That's right, Judge. And that's what I think I was trying to ask earlier as far as to what was the evidence that that requisite amount was taken from the tribe. I think your answer was the billing records are in there. Right, the timesheets that are all submitted on behalf of all of the monitors that were put into evidence in both. The evidence is there. And was there evidence at trial that, in fact, the additional money that was being paid directly by the company should have gone to the tribe and that the tribe wouldn't have turned around and given it to the monitor? No, what the evidence at trial was is that they would have never charged the company so much money. Had it gone through the original way of doing business, they would have charged the companies $25 an hour and given that $25 an hour to the monitors. So the amount of money, when we get into $400 and $500 a day, is, again, like you say, that's the separate issue of how the companies were properly treated. So you didn't argue that the tribe suffered a loss because they didn't get the amount that the monitors were getting from the company? Well, we felt that that was appropriate, that if there was any money to be paid, if there was money paid, it should have gone to the tribe. What happened at trial is that they said, well, we wouldn't have charged that much in the first place. Okay. It would have been $25 an hour for the time they were in the field. Your Honors, unless the Court has any other questions, I thank the Court for its time. I have no questions, thanks. Thank you. Thank you. I guess one of the felons counsel gets the honors of handling a rebuttal argument. I'm not sure. I haven't already ran over our time, and I appreciate it. First, I guess the last shall be first. The $400, the government... Did you start the two minutes running? The government makes it sound like somehow Mr. Oldhorn came up with this $400 amount in order to affect this scheme, and that's simply not the case. The evidence in trial is that David Blair testified, who was the CEO of TransCanada, that that's what they paid their monitors everywhere around the nation. This was for the Keystone XL pipeline, $400 flat. So that was where that dollar amount came from. There was no evidence at all that the tribe would have done different with that amount. It was simply any amount that went for field work always was billed later. And in fact, the tribe was losing money because they weren't billing, and that had nothing to do with Mr. Oldhorn. They weren't billing the 25 even when they were paying it out in payroll, so they were actually losing more money that way. And another thing to keep in mind is that, again, this is a little different sort of a case in the sense that this money was earned. This wasn't money that was taken out of the drawer at the casino and underreported or cooked to books. All of this money, in the government's theory, was money that was paid by companies for monitoring work for those individuals. So it wasn't wrongful gains in any way. And the fact is, Dale Oldhorn never denied this program. He thought he had the authority to do it. And it's important to keep in mind that the record is that the vice secretary, who was one of four. There's only four executive officers in the Crow tribe. The vice secretary signed the same letter that Dale Oldhorn signed, saying that he believed this was policy. Now, at trial, he said that he told him to go to the chairman. That didn't work well because they were not getting along very well. But Mr. Oldhorn always maintained, in the exhibit that didn't get in, that he had the necessary flexibility to run that TIPO office how he could. And finally, you can't sustain a conviction based on what the government wished they would have proven, Your Honors, and that's what they're asking. Thank you, counsel. The court is going to take a brief recess before the last case, but I want to ask a question of all counsel. It may be much too late for this possibility, but I just have wondered, since the case seems to have been initiated on one theory and then shifted to another, and the judge ended up giving very mild sentences here, which are all done. If there's any chance that the complex appellate issues here could be resolved by agreement between the appellants and the government if we deferred submission and sent you all to voluntary mediation? But obviously, mediation is not compelled. We don't want to waste anyone's time. I'm just wondering if there's any possibility of that. Your Honor, from the government's point of view, I'd certainly be willing, but I don't understand. They got such a lenient sentence. They got no prison time. There's not much really to, other than the restitution, and even the restitution was generous. I don't see what the defendants would have, what their motivation would be to come to anything. The only thing is that I guess they could ask us to dismiss the case at this point. Or they could agree to dismiss this case and plead somehow to some lesser charge if there is one. It would be difficult for the government to do that, Your Honor, only because there were all the other monitors of lesser culpability that pled guilty. I see. Okay, well, thank you. That answers my question. Well, thank you all. It's very well argued, and as usual, we appreciate Montana Council coming here and helping us on the law. The case of the various Oldhorn and Danforth appellants versus the United States, defending against the United States, shall be submitted, and the court will recess for 10 minutes before taking up International Franchise Association v. Seattle.
judges: Hawkins, Gould, Ikuta